**No. 17,101.**

### THOMAS *v.* HOOSIER STONE COMPANY.

DEMURRER TO EVIDENCE.—*Admits Facts and Conclusions Drawn Therefrom.*—A demurrer to the evidence admits all the facts of which there is any evidence and all the conclusions which can fairly and logically be drawn from such facts.

SAME.—*Duty of Court to Draw Inference.*—In passing upon a demurrer to evidence the court should consider not only the evidence embodied in the demurrer, but also all such fair and reasonable inferences as the triers of the facts might have lawfully drawn from the evidence.

NEGLIGENCE.—*Plaintiff Free From Contributory Negligence.*—It is as much a part of the plaintiff's cause of action to show affirmatively that he was free from fault or negligence as to show that the defendant was guilty of negligence.

SAME.—*Employe Assumes Ordinary Risks.—Work Outside of Employment.*—An employe, by his contract of employment, impliedly agrees to run all the ordinary and usual risks of danger to himself incident to and connected with the service in which he agrees to engage, although the duties of the service may be necessarily hazardous, but this rule does not apply where his master orders him to perform a service outside of the scope of his employment.

From the Orange Circuit Court.

*C. C. Matson* and *J. Giles*, for appellant.

*W. H. H. Miller, F. Winter* and *J. B. Elam,* for appellee.

McCABE, C. J.—The appellant sued the appellee in the Lawrence Circuit Court to recover damages on account of certain personal injuries alleged to have been sustained by him through the alleged negligence of the appellee. The venue was changed to the Orange Circuit Court, where a trial of the issues formed on the complaint was begun before a jury.

At the close of the appellant's evidence the appellee demurred thereto, in which the appellant joined, and by agreement the jury was discharged, with the further

agreement that the court should assess the damages in case the demurrer should be overruled. The court sustained the demurrer and rendered judgment thereon that the plaintiff take nothing by his suit.

The only error alleged is the action of the circuit court in sustaining the demurrer to the evidence.

The substance of the evidence is as follows:

The appellant testified on his own behalf that he lived in Lawrence county, about a quarter of a mile from the Hoosier Stone Company's quarry; had lived in Lawrence county about fifteen years, and that his occupation for twenty-three years had been working in stone quarries; had worked about three years for the Hoosier Stone Company, commencing in June three years prior to the trial; that he quit work for the defendant on the day he got hurt, November 28, 1891; that he was hired to scabble, which is chipping a stone to a certain size with scabbling picks. The stone is lined and is chipped off with scabbling picks down to the line; had before that been lining some. The only duty I had besides scabbling was to help turn the cuts that had been cut by the channeler. The channeler is a machine that cuts the stone from the ledge in blocks sometimes five or six feet deep and sometimes deeper, and after it is cut it requires a great deal of power to turn the cuts over so they can be taken out, and after they are taken out the channeler has to be turned. Nearly all the men working in the quarry are sometimes called to help turn the cuts. On the 28th day of November last I was ordered by the ledge foreman to go over to what we called the hole and take some pipe down to the blacksmith shop. Alonzo Maddox was the foreman and my immediate superior. I obeyed his directions. The stone has been taken out about 18 feet deep on one side and on the other deeper. There is only one way made or provided to go from the bottom of the

quarry to the top of the ledge. It is a rough path from four to sixteen inches wide in some places, and others two to four feet wide. One side was perpendicular and the other side slanting off into the hole where the stone had been taken out. A part of this way was straight and a part wasn't. There was a certain place I had to make a kind of an angular turn.

On November 28, 1891, I was ordered to go from the scabbling yard down to this hole, by the foreman, Alonzo Maddox, and get some pipe and take it to the blacksmith shop. Another man, David Burke, was sent with me. I picked up the first piece I came to; it was in two pieces that had been screwed together. It was a little crooked, and I picked it up and started off with it up this pathway, the only way I knew of getting from there to the blacksmith shop, where I was to take the pipe, and when I went to make this turn there in the path I had to step around a stone that was right above this hole and about four feet from the ledge, and as I went to step around the stone there was a kind of a perpendicular place, and as I stepped around there the pipe struck the stone above and I fell and got my injuries.

The pathway where I fell from wasn't level, and wasn't over 12 or 14 inches wide; it wasn't over a foot wide where I made the turn. There was a rock above me, and I had to go to the right of it, or climb over it; I couldn't have gone around it on the left side. In making the turn I fell 14 or 16 feet a perpendicular descent into the hole, between some rocks. Have very little recollection about their getting me out; the foreman, Maddox, held me while they lifted us out with the derrick; the derrick is used for handling heavy stone and machinery and anything that is heavy. I had never been called on before to do such work as carrying pipes or any heavy material up that path before. I had helped

two or three times to carry boxes of tools up that path; the boxes had the wedges and tools in them, were about 8 x 20 inches. That was two or three years ago.

There was no warning given by Mr. Maddox or any one else about carrying pipes or anything else up this path. It had been raining, and was slippery, and I had to do the best I could. The path was generally used by the men going down to the mill, and the side channeler men carried their drills up and down there occasionally. I couldn't say that Mr. Maddox hired anybody. I know he had authority to do this much. If he didn't discharge men he sent them to the superintendent, and whoever he sent never came back again in the quarry. I know of his sending men to the office and they never came back to the quarry again to work. I never had any experience in handling pipes of any kind. It was not my business to handle pipes. I don't know whose business it was to do that kind of work in the quarry unless it was the men that had charge of the machinery. I think the pipe I carried was 20 to 23 feet long. It was what they called an inch pipe, and suppose it would weigh 35 or 40 pounds. I had got 35 or 40 feet up the path when I fell, and the path was 80 or 90 feet long. I was hurt in my ankle, foot, and back, by the fall. It laid me up about five months; was confined to my bed about two months before I got up. It was four or five months before I could leave the house. I am not able to work any; can not bear my weight on it now.

I got injured in the back, in the small of the back and the region of the shoulder blade, and it injured my back considerable. My back is in such a condition that if I exercise any I get out of wind and tire down, which makes me unable to do anything. I suffer pain considerable in the foot now. My physicians were Doctor Short and Doctor Freland. Doctor Short waited on me

mostly. Do not know what his bill is, nor that of Doctor Freland. Have never done any work since I was hurt. Have never been able since to do any kind of manual labor. I am nervous.

On cross-examination he said that he had worked in Salem quarries at drilling and scabbling, and on the ledge. Did not work on a derrick there. Might have attached the dogs to the stones there but have no recollection of it. Worked four or five years at Salem quarries and about 15 years in Lawrence county. Have worked about three years in the Hoosier stone quarry. I suppose they have had in Lawrence county channelers, derricks and steam engines for eight years before this accident. These steam engines are supplied with water through pipes. They are put on the outside line of the quarry in sight of the men who work in the quarry. I had seen these pipes, or pipes like them. The pipe I carried was in two pieces joined together and crooked. I discovered as soon as I picked it up that it was crooked and bent. No one told me to pick up that particular piece. Picked it up of my own motion. Was pretty tolerably heavy; was bent and wabbled on my shoulder as I walked. I discovered that soon after I picked it up. Had carried it forty or fifty feet when I discovered it wabbled. It was wabbling all that time. Couldn't walk steadily with it. Discovered that soon after I got it on my shoulder. It was just ten minutes before dinner time, and there was nothing to prevent me from seeing the whole quarry. Had been over the path frequently, and knew the pathway. Had been over it the day before. I was sent down over this pathway to get the pipe and was in the quarry when the orders were given. In order to get where the pipe was I had to go over this pathway. Noticed that it had been raining and was slippery as I went down to get the pipe. Had been over

that path with boxes on my shoulders—boxes they had there in the quarry to keep the wedges and tools in, about 20 inches long and 10 inches wide. Don't suppose I carried such boxes more than two or three times. Sometimes I would be sent to help split a stone or two. That was when they sent me with the boxes. Sometimes for an hour or two I would help break. I mean we break the stone by placing the wedges in the cracks of a stone, or the holes that were drilled in the stone, and break the stone. Couldn't say how often I did that. That is all I remember of doing now. That is all I ever did except to carry this pipe. During the time I was there that was all the kind of work I ever did in that quarry. When a job of scabbling was finished, and when there was other work around there in the quarry, I and others did not join right in and help do the work. In addition to scabbling and carrying the boxes and splitting stone, sometimes I helped turn cuts—that is turning the stone that is three or four feet thick and ten or twelve feet long, and the men that work in that business get everything ready to turn the cuts, and the ledge boss sometimes calls nearly all the men working in the quarry to help. Can't tell how frequently I helped, but know I did whenever he asked me. When I was lining a stone, I was often called to help them turn the cuts. No one told me to take the pathway I took to carry up the pipe. The pathway was not over 15 or 16 inches broad where I fell. It was the beaten down place. There is a broad place there but I had to make that step there so that I could get around. Mr. Joe Evans was the superintendent. I don't know what Mr. Evans' duties were compared with Mr. Maddox. The whole quarry was under Mr. Evans' supervision. Alonzo Maddox is simply a ledge boss there. We had but the one ledge boss in that quarry, and that was Mr. Maddox; and the other man,

Mr. Evans, was the general superintendent.  Mr. Joe Evans paid me for my services while there, and sometimes Mr. Malott paid me.  Being asked, did Mr. Maddox ever pay you?  answered, yes sir; but I think the money came out of the hands of Mr. Evans.  Mr. Thornton hired me.  I never quit work there until Mr. Maddox came and told me that he would have to lay me off for a while.  Mr. Evans told me to come back.

On re-examination in chief he said:  This pathway changed sometimes, by reason that it came upon the ledge where they were at work, and when a cut was made by the channeler it would take some of the path. I saw that done.  There had been considerable change made in the path in the last week before I got hurt.  I knew the condition of the path as I walked down it after the pipe.  Another witness, David Burke, testified on behalf of appellant to substantially the same facts, and in addition thereto that he was engaged in the same service with appellant, and that he carried up said path four pieces of pipe of the same size but different lengths, from six to twelve feet long.  All the rest of the evidence was expert testimony of the attending physician as to the nature and extent of appellant's injuries.

The theory of the complaint is that appellant had been employed for the sole and only service of scabbling stone and helping to turn the cuts in the quarry and for no other service whatever in said quarry, at a stipulated price per day, and that Maddox, the foreman, was clothed with the authority to hire and discharge any or all of the employes in the quarry and that he represented the common master in authority to command and direct in what they should do in the common service, and that in that capacity he directed and commanded the appellant to perform the work of carrying the pipe up the narrow path, which was dangerous and more hazardous

than the service for the performance of which he had bound himself by his contract, and that in his attempt to obey such command and while exercising due care and caution he fell and was thereby injured.

It is settled law that an employe, by his contract of employment, impliedly agrees to run all the ordinary and usual risks of danger to himself incident to and connected with the service in which he agrees to engage, and this is true though the duties of the service may necessarily be hazardous. *Vincennes Water Supply Co.* v. *White*, 124 Ind. 376; *Brazil, etc., Co.* v. *Hoodlet*, 129 Ind. 327; *Indianapolis, etc., R. W. Co.* v. *Watson*, 114 Ind. 20; *Pittsburgh, etc., R. W. Co.* v. *Adams*, 105 Ind. 151.

A different rule prevails where the master orders him to perform a service outside of the scope of his employment, especially if it be of a more hazardous character. *Pittsburgh, etc., R. W. Co.* v. *Adams, supra; Cincinnati, etc., R. R. Co.* v. *Madden*, 134 Ind. 462.

The first question that arises on the demurrer to the evidence is whether the service the appellant was ordered to perform was outside of the scope of his employment. The evidence fails to establish what the contract of employment was, or what the nature of the duties or the services imposed by it on the appellant were. It is true it shows that he served the appellee in the performance of several kinds of work. And it is contended by the appellant that any fact the jury might have reasonably and logically inferred from the evidence must be regarded as established. A demurrer to evidence admits all facts of which there is any evidence, and all conclusions which can be fairly and logically drawn from such facts. *Trimble* v. *Pollock, Admr.*, 77 Ind. 576; *Lindley* v. *Kelley*, 42 Ind. 294; *Strough* v. *Gear*, 48 Ind. 100; *Newhouse* v. *Clark*, 60 Ind. 172; *Fouch* v.

*Wilson*, 60 Ind. 64; *Baker* v. *Baker*, 69 Ind. 399; *Ohio, etc., R. W. Co.* v. *Collarn*, 73 Ind. 261.

In other words, in passing upon a demurrer to evidence, the court should consider not only the evidence which is embodied in the demurrer, but also, all such fair and reasonable inferences as the triers of the facts might have lawfully drawn from the evidence. It is insisted by the learned counsel for the appellant, substantially, that as the evidence shows that appellant worked at scabbling stone and helping to turn the cuts, it may fairly and reasonably have been inferred by the jury, that his contract of employment was for, and embraced that work alone, and none other. Conceding, without deciding, that such an inference might have been drawn had the evidence shown that he had always performed that kind of work and no other while he was in the appellee's service, yet the evidence does not make that kind of a case. If the jury might have inferred from the fact that he performed the work of scabbling or chipping off stone down to a given line, that such work was embraced in his contract, by the same rule they would also be authorized to infer that other work done by him in the quarry was embraced in his contract of hiring. The evidence shows that he did some lining of the stone after they were cut from the quarry by the channelers; that he did some splitting of stone and carrying tools in boxes up and down the path in question.

The same rule of inference that would authorize the jury to infer that he was hired to scabble stone because he worked at it, would also authorize them to infer that he was employed to split stone, to line stone, to carry tools in boxes, pipes, and other things when necessary, up and down the narrow path in question. If one of these inferences may be fairly and logically drawn by the jury from this evidence, so may the other. That being true,

we have a case where the injury complained of was the result of one of the dangers incident to the business in which he was employed to engage, and the risk of which he impliedly agreed to take upon himself.

There is another reason why the demurrer to the evidence was properly sustained. It was as much a part of his cause of action to show affirmatively, as he had alleged, that he was free from fault or negligence as to show that the appellee was guilty of negligence. *Pennsylvania Co.* v. *Meyers, Admx.*, 136 Ind. 242.

It was not enough to show that the appellee was guilty of negligence. He must show also the absence of negligence on his part. The evidence does not authorize the inference that the path was unsafe for the purposes for which it was used generally. But common sense would readily suggest to any one that more care must be observed in carrying some things up or down that path than others. As it was crooked at one place, at least, and on one side was the cavity into which one losing his balance was liable to fall, on the other a perpendicular wall, and it as winding as the path, it is difficult to see how the jury could infer from the evidence that appellant was observing ordinary care and caution when he fell.

He knew before he started up the path that the pipe was crooked, which caused it when placed on his shoulder to wabble, which means to move staggeringly. Of all the places where common prudence would warn a man that he would want to be free from all staggering motions, it would be on a path like the one described in the evidence. The pipe, about 23 feet long, only weighed 35 or 40 pounds. It might have been carried past the narrow place in the path in one hand instead of on the shoulder, and thereby, perhaps, the wabbling or staggering motion may have been avoided. If we

are not justified in saying that this evidence shows con-tributory negligence on the part of appellant, we are justified in holding as we do that it is not sufficient to warrant the inference that the appellant was exercising care and caution for his own safety proportionate to the danger he knew he was encountering when he lost his balance and fell.    The evidence must be such as to justify this inference before any recovery thereon can be had by the appellant, even though every other allegation of his complaint be amply and satisfactorily proven.

We need not and do not decide whether Maddox, the foreman, when he gave the order, was acting as the representative of the appellee, the common master or not. Nor need we decide what inference the triers of the facts might have drawn from the evidence as to the relations of Maddox to the common master and to the appellant in giving the order.    No matter what that relation was, it follows from what we have said that no inference that the appellant did not impliedly agree to take upon himself the risk of the unfortunate injury he received could have been justified by the evidence, and neither could the inference therefrom be justified that he acted with due care and caution when he fell.    The lack of either of these inferences as a fact would defeat the appellant's right to recover on the evidence and justify the action of the circuit court in sustaining the demurrer to the evidence.

The judgment is, therefore, affirmed.

Filed Jan. 16, 1895.